UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN NATIONAL INSURANCE COMPANY, AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY, FARM FAMILY LIFE INSURANCE COMPANY, FARM FAMILY CASUALTY INSURANCE COMPANY, and NATIONAL WESTERN LIFE INSURANCE COMPANY, | § § § § § § § § § | C.A. No. 1:09-CV-01743-RMC |
| Plaintiffs, | § § | |
| vs. | § § | |
| JPMORGAN CHASE & CO. and JP MORGAN CHASE BANK, NATIONAL ASSOCIATION, | § § § § | JURY TRIAL DEMANDED |
| Defendants, | § § | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR WASHINGTON MUTUAL BANK, HENDERSON, NEVADA, | § § § § § | |
| Intervenor-Defendant. | § | |

PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs, American National Insurance Company, American National Property and Casualty Company, Farm Family Life Insurance Company, Farm Family Casualty Insurance Company, and National Western Life Insurance Company (collectively, "Plaintiffs") file this, their First Amended Complaint against Defendants JPMorgan Chase & Co. ("JPMC & Co.") and JPMorgan Chase Bank, National Association ("JPMC Bank") (collectively, the "JPMC Defendants").

**Parties**

1.      Plaintiff American National Insurance Company ("ANICO") is a Texas insurance company with its principal place of business at One Moody Plaza, Galveston, Texas 77550.

2.      Plaintiff American National Property and Casualty Company ("ANPAC") is a Missouri insurance company with its principal place of business at 1949 East Sunshine, Springfield, Missouri 65808.

3.      Plaintiff Farm Family Life Insurance Company ("FFLIC") is a New York insurance company with its principal place of business at 344 Route 9W, Glenmont, New York 12077.

4.      Plaintiff Farm Family Casualty Insurance Company ("FFCIC") is a New York insurance company with its principal place of business at 344 Route 9W, Glenmont, New York 12077.

5.      Plaintiff National Western Life Insurance Company ("NWL") is a Colorado insurance company with its principal place of business at 850 East Anderson Lane, Austin, Texas 78752.

6.      Defendant JPMorgan Chase & Co. ("JPMC & Co.") is a bank holding company incorporated in Delaware with its principal place of business at 1 Chase Manhattan Plaza, 59th Floor, New York, New York 10005-1401.   JPMC & Co. was served with the Plaintiffs' Original Petition, filed in Texas state court, and process on February 24, 2009, and thereafter filed a Special Appearance and, subject thereto, an Original Answer and other pleas.  JPMC & Co. may be served with this Plaintiffs' First Amended Complaint by service upon its counsel of record.

2

7.      Defendant JPMorgan Chase Bank, National Association ("JPMC Bank") is a wholly owned subsidiary of JPMC & Co.  JPMC Bank is a national banking association incorporated in the state of New York with its principal place of business at 270 Park Ave., New York, New York 10017-2070.   JPMC Bank was served with Plaintiffs' Original Petition and process on February 24, 2009, and thereafter filed a Special Appearance and subject thereto, an Original Answer and other pleas.  JPMC Bank may be served with this Plaintiffs' First Amended Complaint by service upon its counsel of record.

8.      The Federal Deposit Insurance Corporation ("FDIC") is an agency of the United States created by the Federal Deposit Insurance Act, 12 U.S.C. § 1811 et seq. and related laws and regulations. The FDIC intervened as a defendant in the instant case in its capacity as the Receiver for Washington Mutual Bank ("FDIC-Receiver"). Intevernor-Defendant FDIC-Receiver may be served by and through its counsel of record.

## Jurisdiction and Venue

9.      Plaintiffs initiated this action by filing a state-court complaint in the 122nd District Court of Galveston County, Texas, on February 16, 2009.

10.      The FDIC-Receiver, on March 25, 2009, intervened in this case as a defendant and immediately removed the case to federal court.  In its Notice of Removal, the FDIC-Receiver mistakenly asserted that "Plaintiffs' claims of tortious interference with an existing contract, breach of confidentiality agreement, and unjust enrichment against JPMC Bank and JPMC & Co. depend on application and interpretation of the FDIC's regulatory scheme and administrative framework as set forth in Chapter 16 of Title 12 of the United States Code, 12 U.S.C. §§ 1811 through 1835a."  The United States Court of Appeals for the District of Columbia subsequently rejected the FDIC-Receiver's assertions in this regard

and thus its justification for intervention and removal, in *American Nat'l v. FDIC*, 642 F.3d 1137, 1145 (D.C. Cir. 2011).

11.     The JPMC defendants also filed a Notice of Removal, and asserted an additional ground of diversity jurisdiction as a basis for this case's removal to federal court.

12.     On September 9, 2009, the United States District Court for the Southern District of Texas denied the Plaintiffs' motion for remand and granted the FDIC-Receiver's and the JPMC Defendants' motion to transfer venue.  Accordingly, on that date, the Court issued a Memorandum and Order, transferring the instant case to the United States District Court for the District of Columbia.

## Factual Background

13.     Beginning several years prior to 2008, JPMC & Co. recognized that it lacked a significant retail banking presence in either California or Florida, two markets that JPMC & Co. viewed as among the most important to JPMC & Co.

14.     In the Spring of 2008, Washington Mutual was the largest savings and loan association in the United States. The business operations of Washington Mutual consisted of Washington Mutual, Inc. ("WMI"), a parent holding company, and Washington Mutual Bank ("WMB"), a wholly-owned subsidiary.

15.     WMI was a holding company incorporated in the State of Washington with its principal place of business in the State of Washington.

16.     WMB was a federally chartered stock savings bank with its home office in Henderson, Nevada.   WMB's primary executive and business office was in Seattle, Washington.

17.     WMB contained the banking operations of Washington Mutual, and in early 2008 WMB had more than 43,000 employees, 2,200 branch offices in 15 states, and $188.3 billion in deposits.

18.     WMB had a substantial footprint in both California and Florida.  JPMC & Co. considered WMB to be an attractive acquisition target.

19.     In early 2008, JPMC & Co. created a project group from multiple business units with a goal of exploiting WMB's financial challenges in order to acquire Washington Mutual's banking operations.  This group was given the code name "Project West," which was known only to JPMC & Co. insiders and certain third parties, such as rating agencies and regulators.  JPMC & Co. gave itself the code name, "Park."

20.     One member of JPMC & Co.'s Project West was Executive Vice President / Chief Executive Officer of Retail Financial Services, Charlie Scharf.  As Mr. Scharf declared on October 2, 2008:

> During the last few years as we have been building our own business, we kept track of banks that would complement our franchise and help us become a better bank for our customers, our employees and our shareholders.  Washington Mutual consistently was at the top of the list.

21.     According to statements of Mr. Scharf and executives of JPMC & Co. made after JPMC & Co. acquired WMB, JPMC & Co. created a Project West "war room" in JPMC & Co.'s headquarters in New York, where JPMC & Co. closely monitored the financial activity of WMB.  As one executive boasted, "We were watching money 'fly out of the bank.'"   Grind, K., "What a Deal," Portfolio.com, Dec. 28, 2009, http://www.portfolio.com/industry-news/banking-finance/2009/12/28/what-a-deal-jp-morgan-got-for-wamu/index.html.

22.     JPMC & Co. executives, in March of 2008, conceived of a plan for JPMC & Co. to acquire WMB through exploitation of confidential information and government intervention, with stakeholders of WMB, including the Plaintiffs, being stripped of their rights.

23.     On March 11, 2008, JPMC & Co. entered into a confidentiality and stand-still agreement with WMI regarding a "possible negotiated transaction" involving WMI and/or WMB (the "Confidentiality Agreement").  The Confidentiality Agreement was also modified on March 12 and 13, 2008, in certain minor respects.

24.     The Confidentiality Agreement covered all information furnished to JPMC & Co., and its subsidiaries and representatives, by or on behalf of WMI, WMB and their representatives "in connection with the Transaction," and "all analyses, compilations, data, studies, notes, translations, memoranda or other documents prepared by you or your Representatives containing or based in whole or in part on any such furnished information[.]"

25.     JPMC & Co. also agreed, pursuant to the Confidentiality Agreement, to use information obtained pursuant to the agreement "solely for the purpose of evaluating a Transaction" and to keep such information "strictly confidential."

26.     JPMC & Co. agreed, pursuant to the Confidentiality Agreement, not to "disclose to any person the fact that any investigations, discussion or negotiations are taking place concerning a possible Transaction with the other party, the fact that you have requested or received Information from [WMI or WMB] or that information has been made available to you by or on behalf of the Company[.]"

27.     JPMC & Co. further agreed to "promptly destroy all Information which has been furnished" pursuant to the Confidentiality Agreement if a transaction was not pursued. JPMC & Co. also agreed to "continue to be bound by [its] confidentiality and other obligations hereunder" even if a transaction was not pursued.

28.     In addition, JPMC & Co., agreed to a "stand-still" provision as part of the Confidentiality Agreement.  Particularly, JPMC & Co. agreed that

> for a period of eighteen months from the date of this agreement, neither you nor any of your affiliates will, directly or indirectly, on an unsolicited basis unless invited to do so by the Board of Directors of the Company in writing: (i) acquire, offer or propose to acquire, or agree or seek to acquire, by purchase or otherwise, . . . any assets of the Company or any subsidiary or division thereof; . . . [or] (viii) enter into any discussion, negotiations, arrangements or understandings with any other person with respect to any of the foregoing activities or propose any of such activities to any other person[.]"

29.     JPMC & Co. agreed that "money damages may not be a sufficient remedy for any breach of this agreement" and that "equitable relief, including injunction and specific performance," would be an appropriate remedy for JPMC & Co.'s breach of the Confidentiality Agreement.

30.     The Confidentiality Agreement further provided that its listed choice of forum was not exclusive: "The parties hereby irrevocably and unconditionally consent to submit to the nonexclusive jurisdiction of the courts of the State of New York located in the County of New York and of the United States of America located in the Southern District of New York with respect to any actions, suits or proceedings arising out of or relating to this agreement and the transactions contemplated hereby[.]"

31.     The Confidentiality Agreement extended the benefits of the agreement to WMI and WMB stakeholders whose confidential information was sought by JPMC & Co.

and who would be adversely affected by JPMC & Co.'s breach of the agreement.   The Confidentiality Agreement stated that "[t]his agreement is for the benefit of the Company and the Company's Representatives and their respective successors and assigns[.]"   The Confidentiality Agreement explained that "Company" meant WMI and "all subsidiaries of the Company[.]"   In addition, the Confidentiality Agreement explained that "Company's Representatives" included "directors, officers, employees, representatives, advisors and/or agents of the Company[.]"

32.     The Confidentiality Agreement further specified that the agreement "will be governed by and construed in accordance with the laws of the State of New York."

33.     JPMC & Co. violated the Confidentiality Agreement before March was out. JPMC & Co. disclosed confidential information to and discussed the potential WMB acquisition with regulators and other third parties.   An internal JPMC & Co. email dated March 25, 2008, for example, details a "Project West timetable" that refers to "Regulatory meetings," "Investor / agency communication," and meetings with "rating agencies." Particularly, a meeting with regulators was scheduled for March 28, 2008.   Another meeting with rating agencies was scheduled for early April.

34.     An email chain from March of 2008 shows that JPMC & Co. sought government intervention in its plan to acquire WMB.   In these emails, a JPMC & Co. executive commented on negotiations with federal regulators, stating "[i]t sounds to me like the government is really concerned as they should be about taking losses, so they should like this versus alternative."

8

35.     On March 31, 2008, JPMC & Co. submitted a bid to WMI to purchase WMI and WMB for no more than $8 per share, with the final price depending on how WMB's loans performed.

36.     On April 8, 2008, WMI formally rejected JPMC & Co.'s offer, and instead announced a deal with a private investor group, whereby it would receive a capital infusion of approximately $7 billion.

37.     After the JPMC & Co.'s bid was rejected, JPMC & Co. did not destroy all such confidential information in its possession.   Instead, JPMC & Co. retained WMB's confidential information and used such information in furtherance of its scheme to acquire the assets of WMB, stripped of the liability to bondholders and other stakeholders.

38.     For example, JPMC & Co. made presentations to rating agencies concerning WMB's creditworthiness using WMB's confidential information. An April 4, 2008 internal JPMC e-mail attaches a draft presentation to rating agencies including selective information about "West's" mortgage portfolio.  The analysis of the data used in this, and later rating agency presentations, contained assumptions that unfairly reflected WMB's credit worthiness.

39.     In addition, JPMC & Co. used WMB's confidential information to clear the field of potential investors and purchasers for WMI and/or WMB, who might compete with JPMC & Co.

40.     For example, on or about June 5, 2008, JPMC & Co.'s Chairman and Chief Executive Officer, James Dimon, met with officials of a bank that had expressed interest in purchasing or investing in WMB.  When asked why JPMC & Co. did not purchase WMB in April of 2008, Dimon misleadingly replied that he thought "the potential [WMB] losses are

higher than [the successful bidder] is estimating."  After the meeting, Dimon instructed his staff to monitor this potential purchaser in order to ensure that WMI's efforts to find an investment partner did not culminate in a deal with this other bank: "[i]t is important to have an open dialogue with [this bank], as [this bank] would not pursue any one of these opportunities if JPMorgan were to do the same."

41.     A June 17, 2008 email string between JPMC & Co. executives with a subject of "West output" also shows JPMC & Co.'s summary of "West Potential partners," companies that could compete with JPMC & Co. in seeking to invest in or purchase Washington Mutual at a fair negotiated price, without JPMC & Co.'s interference.

42.     In June and July of 2008, JPMC & Co. continued to meet with regulators in furtherance of its plan to acquire WMB through regulatory intervention. An internal JPMC e-mail chain from July 17, 2008, refers to an upcoming meeting with regulators, and states that "[w]e are thinking through how to make up the assisted scenario – we may get more color tomorrow with the regulators – if not we'll make something up."

43.     Attached to this July 17, 2008 e-mail chain is a presentation disclosing information containing an "Analysis of West capital strategy," which compared three alternatives for acquisition of WMI and/or WMB by JPMC & Co.  The presentation contained a detailed analysis of WMB's asset and mortgage portfolios.  Of the three alternatives – and several months before WMB's receivership – the alternative described as "Regulatory relief" was deemed superior by JPMC & Co., because it had a "Meaningfully less capital impact than other options." Other options were variously described as "Dilutive," "Unrealistic," or less favorable because it "Erodes quality of Tier I composition" or faced limitations regarding "Market capacity."  The presentation noted that, regarding

"Regulatory relief," JPMC & Co. representatives "Have discussed with Fed on prior occasions."

44.     An August 3, 2008 JPMC & Co. presentation shows that JPMC & Co. specifically anticipated acquiring WMB though the FDIC receivership process.  Among the matters discussed in the presentation were, "Park acquires West lead thrift subsidiary from Receiver"; "Accounting for an acquisition of a business – resulting in a negative goodwill situation"; and "REIT preferred securities ($3.9bn) are extinguished as they are assumed to become liabilities of the holding company upon receivership or bankruptcy, increasing net asset value of lead thrift bank."  Among other things, JPMC & Co. analyzed an acquisition of WMB from an FDIC receivership under circumstances where "Senior and unsecured debt [was] left behind."

45.     On August 10, 2008, JPMC & Co. made another presentation to credit rating agencies evaluating WMB.

46.     Upon information and belief, JPMC & Co.'s presentations to credit rating agencies during the Summer of 2008 used and disclosed confidential information that was protected by the Confidentiality Agreement.

47.     JPMC & Co.'s presentations to credit rating agencies during the Summer of 2008 overestimated WMB's loan losses and underestimated WMB's liquidity and financial health.

48.     Following JPMC & Co.'s presentations, Moody's put WMB on a credit watch on July 22, 2008, and S&P negatively changed WMB's credit rating on July 23, 2008.  These credit events directly led to a loss of 25 percent or more of the value of Plaintiffs' WMB bonds.

49.     In early September, three weeks before WMB was seized, FDIC officials, acting in their corporate capacity, informed JPMC & Co. that the FDIC was carefully monitoring WMB and that a seizure of its assets was anticipated and that the FDIC would want to immediately auction off WMB's assets.

50.     At the early September meeting between JPMC & Co. and the FDIC, or shortly thereafter, JPMC & Co. disclosed to the FDIC the extent and substance of JPMC & Co.'s due diligence conducted in March of 2008 and continuing thereafter.   Upon information and belief, JPMC & Co. convinced the FDIC that JPMC & Co. was the most prepared of all potential purchasers of WMB due to such due diligence.

51.     Upon information and belief, JPMC & Co., as a condition to discussing a potential purchase of assets from a potential FDIC receivership, also signed a separate confidentiality agreement with the FDIC in which JPMC & Co. agreed to keep information relating to the potential FDIC sale strictly confidential (the "FDIC Confidentiality Agreement").   According to the FDIC web site, all prospective purchasers of assets of a receivership must enter into a confidentiality agreement prior to the release of such information.   As the FDIC explains, "Prospective purchasers must execute the Confidentiality Agreement that is provided either online or in person at the due diligence location.  The FDIC must receive an executed Confidentiality Agreement before it will allow     access     to     files     or     other     specific     loan     information."     *See* http://www.fdic.gov/buying/loan/loan/index.html.

52.     Upon information and belief, the FDIC Confidentiality Agreement signed by JPMC & Co. on or about September 4, 2008 was substantially similar to the form FDIC Confidentiality Agreement that is available on the FDIC's web site.   *See*

http://www.fdic.gov/buying/loan/confidentiality/confidentiality.pdf.   That confidentiality

agreement on the FDIC's web site states, "Bidder's execution of this [agreement], **without**

**modification**, is a prerequisite to receipt of such Evaluation Material" (emphasis in

original).

53.   The FDIC Confidentiality Agreement required that JPMC & Co. "may use

the Evaluation Materials *solely* for the purpose of evaluating any Loans offered for sale by

FDIC" (emphasis added).   In addition, the FDIC Confidentiality Agreement also provided

that JPMC & Co. "may not disseminate or divulge the Evaluation Material to any

individual or entity," with certain exceptions not applicable to this case.

54.   One of the FDIC's remedies against JPMC & Co. for a breach of the FDIC

Confidentiality Agreement is a right of indemnification.   As the FDIC Confidentiality

Agreement provides, JPMC & Co. "must defend, indemnify and hold harmless FDIC from

and against *any and all claims*, demands, causes of action, losses, damages, liabilities,

judgments, costs and expenses (including attorneys' fees) asserted against or incurred by

FDIC as a result of 1) any violation of, or failure to comply with, the provisions of this

[agreement] by Bidder . . ." (emphasis added).   Given the broad scope of the FDIC's

indemnification rights, injury to WMB stakeholders such as the Plaintiffs was a risk that

was contemplated and reasonably foreseeable as a result of improper disclosure of

information by a bidder such as JPMC & Co.

55.   In its private discussions with the FDIC, JPMC & Co. knowingly

overestimated WMB loan losses and otherwise disparaged WMB's financial health.   The

extent of JPMC & Co.'s misinformation is apparent from a comparison between JPMC &

Co.'s presentation slides provided to the FDIC and credit rating agencies before September

25, 2008, and the extraordinary gains and interest income accretion that were recognized by the JPMC Defendants after September 25, 2008.  In addition, data provided to the Supervisory Capital Assessment Program between February and April of 2009, as part of a government-mandated banking "stress test," shows that JPMC & Co.'s estimates of WMB's loan losses during the summer of 2008 were exaggerated.

56.     JPMC & Co. also disclosed to various third parties that JPMC & Co. was discussing with the FDIC a potential acquisition of WMB.  Such third parties included credit rating agencies, investors, and, upon information and belief, news media, in an effort to incite a bank run on Washington Mutual deposits and to drive down WMB's credit rating.

57.     Upon information and belief, during the summer of 2008, JPMC & Co. engineered a campaign involving adverse media "leaks," stock sales, and deposit withdrawals designed to distort the market and regulatory perception of WMB's financial health.  JPMC & Co. continued this campaign up until the government's seizure of WMB.

58.     By July of 2008, it became apparent to WMI and/or WMB that JPMC & Co. was responsible for spreading "economic misrepresentations" concerning WMB.  On July 25, 2008, for example, Mr. Bruce W. Fletcher, a Washington Mutual First Vice President and Assistant General Counsel, wrote to Stephen M. Cutler, JPMC & Co.'s Vice President, General Counsel and head of the company's Legal and Compliance activities worldwide, seeking help in resolving difficulties relating to a "wide variety of economic misrepresentations" being made about WMB.

59.     As Mr. Fletcher explained:

The misrepresentations are various – Washington Mutual is going out of business, it is headed for bankruptcy, it is headed for a receivership; depositors' money will be lost, accounts will be blocked for long periods of time, lawsuits will be necessary – but the concluding suggestions are the same: bring your money to us.

60.    Mr. Fletcher noted that JPMC & Co. was responsible in particular for one recent misrepresentation regarding WMB:  "The latest spark reported by customers is that the manager of a Chase Bank branch on Brighton Beach in Brooklyn is telling customers that they should 'remove all funds from Washington Mutual because their failure is imminent.'"

61.    Mr. Fletcher asked for Mr. Cutler's assistance in remedying JPMC & Co.'s misrepresentations, and asked that JPMC & Co.

spread the word that Washington Mutual, through its subsidiaries, is one of the nation's leading consumer and small business banks.  As of June 30, 2008, Washington Mutual and its subsidiary banks had assets of $309.73 billion.  The company has a history dating back to 1889 and its subsidiary banks currently operate approximately 2,300 consumer and business banking stores throughout the nation.

Upon information and belief, JPMC & Co. never made any effort to remedy "economic misrepresentations" made by JPMC & Co. or its agents or employees.

62.    During the Summer of 2008, news media outlets ran many stories that discussed WMI's unsuccessful efforts to sell itself, the FDIC's pending involvement in the sale of WMB assets, and other aspects of WMB's financial health.  Many of these news stories were sourced by unnamed "investment bankers" close to the negotiations.  As a CNN Money article dated September 18, 2008 stated, regarding the merger rumors about WMI and other banks, "You have bankers throwing rumors around trying to see how the market would react to things."  The Wall Street Journal on September 19, 2008 reported

that JPMC & Co. was reviewing WMB's books, and was "biding its time on a potential bid," according to "people close to J.P. Morgan."

63.     On September 7, 2008, WMI and WMB entered into memorandums of understanding with the Office of Thrift Supervision ("OTS") concerning "aspects of the bank's operations, principally in several areas of its risk management and compliance functions, including its Bank Secrecy Act compliance program."  In these memorandums of understanding, WMI and WMB committed to provide the OTS "an updated, multi-year business plan and forecast for its earnings, asset quality, capital and business segment performance."  The business plan did not, however, require Washington Mutual to raise capital, increase liquidity or make any changes to the existing products and services it provided to its customers.

64.     On September 11, 2008, WMI released preliminary third quarter financial results, which showed that the company was well capitalized and liquid.  In its release, the company stated

> "[T]he company continues to maintain a strong liquidity position with approximately $50 billion of liquidity from reliable funding sources.  The company's tier 1 leverage and total risk-based capital ratios at June 30, 2008 were 7.76% and 13.93%, respectively, which were significantly above the regulatory requirements for well-capitalized institutions.  The company expects both ratios to remain significantly above the levels for well-capitalized institutions at the end of the third quarter."

65.     On or about September 12, 2008, WMI and WMB hired Goldman Sachs as an advisor to help find a buyer.

66.     Also on September 12, 2008, the Bloomberg financial news organization reported that JPMC & Co. was in "advanced talks" to buy WMB.  Negotiations were

described as being conducted "at the highest levels of both companies" and included JPMC & Co.'s CEO Dimon and WMI's CEO Alan Fishman.

67.     JPMC & Co. required, as a term of its renewed "negotiations" with WMI and WMB, that JPMC & Co. be permitted access to WMB's non-public, confidential, financial records.   WMI and WMB allowed this, but also required that JPMC & Co. agree to the terms of the March 2008 Confidentiality Agreement.   JPMC & Co. represented to WMB that it would not disclose WMB's confidential information.   JPMC & Co., however, had no intention of keeping this WMB information confidential.

68.     JPMC & Co.'s "advanced talks" with WMI and WMB were a sham and a pretext designed to gain access to additional, updated confidential financial information of WMB.   JPMC & Co. misrepresented to WMI and WMB that it would negotiate in good faith for the purchase of the company.   On information and belief, JPMC & Co. did not disclose to WMI or WMB that JPMC & Co. was planning to use the confidential information obtained to negotiate with and submit a bid to the FDIC for the seizure and purchase of WMB's assets.

69.     Upon information and belief, JPMC & Co. knew that the FDIC would be more likely to support seizure and sale of WMB assets if JPMC & Co. was ready and willing to purchase such assets.

70.     In addition, upon information and belief, JPMC & Co. knew that the FDIC preferred to sell WMB assets to JPMC & Co., rather than any other potential buyer, because JPMC & Co. had led the FDIC to believed that JPMC & Co. was uniquely prepared as a result of its due diligence conducted since March of 2008.

71.     JPMC & Co. therefore did not intend to deal directly or honestly with WMB, but instead planned to obtain WMB from an FDIC receivership, stripped of obligations to WMB bondholders including the Plaintiffs.  A September 11, 2008 email from a JPMC & Co. executive shows that JPMC & Co. sought to "acquire assets and liabilities of West's thrift subsidiaries but leave behind senior and unsecured debt with the FDIC ($15.2bn)."

72.     On September 12 and 14, 2008, JPMC & Co. made presentations providing further detail on a transaction in which JPMC & Co. would acquire "West's thrift subsidiaries from Receiver" and "Senior and unsecured debt [of WMB] left behind ($14.1bn) remain with Receiver."

73.     According to JPMC & Co. documents dated September 19, 2008, JPMC & Co. presented its plan regarding "Park potential acquisition of West," to rating agencies.  In this presentation material, JPMC & Co. informed ratings agencies, among other things, that:

- JPMC & Co. "Had spoken to FDIC about Bank only in receivership with protection" acquisition;
- "[FDIC] met with West – had to open books";
- FDIC "Want[s] a solution by Friday, September 26th";
- JPMC & Co.'s "Approach is to work directly with the FDIC."

74.     In these September 19, 2008 presentations to rating agencies, and in a presentation of the same date to JPMC & Co.'s board of directors, JPMC & Co. discussed its plan to "Buy bank out of receivership," which included the potential "to leave debt behind."

75.     By September 23, 2008, the Financial Times was reporting that "people familiar with the talks" involving the WMB purchase said that the OTS was pushing for a speedy solution, but "[o]ne challenge for an outright sale of Washington Mutual is that the

acquiring bank would have to take on WaMu's troubled mortgage portfolio, as well as the bank's litigation risk."

76.     Between September 15, 2008 and September 25, 2008, WMB customers withdrew $16.7 billion in deposits, thus achieving JPMC & Co.'s goal of creating a bank run at WMB.   Former OTS director John M. Reich testified to the United States Senate Permanent Subcommittee on Investigations that WMB's seizure was caused by an asserted liquidity crisis prompted by this "run on deposits".

77.     In September of 2008, JPMC & Co. shared the confidential information with outside investors in order to arrange an $8 billion capital infusion that would enable JPMC Bank to maintain its Tier 1 capital ratio.   An investigative article published by the Wall Street Journal on September 29, 2008 details how JPMC & Co. contacted 10 major financial firms, many of whom were significant JPMC & Co. shareholders, asked them if they were interested in investing in the "strategic acquisition of a retail bank," and shared material non-public information relating to the acquisition.   Nine out the ten firms contacted chose to invest, and JPMC & Co. was able to raise over $11.5 billion within 24 hours after the FDIC awarded JPMC & Co. WMB's assets in late September of 2008.

78.     On September 22, 2008, JPMC & Co. scheduled additional meetings with the credit rating agencies "to tell them about the FDIC process and that we intend to be a bidder" for WMB and prepared materials for the rating agencies "concerning our credit due diligence [of WaMu] in March and again now."

79.     Between September 19 and 24, 2008, JPMC & Co. met with the major rating agencies.   During those meetings, JPMC & Co. informed the rating agencies that it

was considering a transaction for WMB out of receivership and disclosed confidential information of WMB.

80.     According to the credit rating agencies Moody's and Fitch, JPMC & Co.'s communications affected their decision to downgrade WMB.  JPMC's communications to rating agencies therefore resulted in further injury to the value of the Plaintiffs' bonds.  For example, Moody's downgraded WMB's credit rating from Baa2 to Baa3 on September 11, 2008 and put WMB on another credit watch on September 22, 2008.  S&P negatively changed WMB's credit rating on September 15, 2008, and Fitch likewise negatively changed WMB's credit rating on September 18, 2008 and September 24, 2008.

81.     The panic and credit downgrades caused by JPMC & Co.'s actions and wrongful disclosures and misstatements to credit rating agencies, media outlets and others fomented panic relative to WMB's liquidity and viability and caused injury to the Plaintiffs by reducing the value of their WMB bond holdings.

82.     Essentially conceding its previous breaches of the Confidentiality Agreement, JPMC & Co. also affirmatively sought, as part of its negotiations with FDIC for the purchase of WMB assets, an indemnification "from the FDIC for any potential breach of an agreement dated March 11, 200[8] with Washington Mutual, Inc. (WMI) caused by its acquisition of the assets and liabilities of the Bank from the Receiver as set forth in its bid." The FDIC Board of Directors refused and granted indemnity only for claims by WMI or claims based on liabilities of WMI or WMB, but not for claims by third parties against JPMC & Co. or JPMC Bank.

83.     On Tuesday, September 23, 2008, the FDIC sought bids from select bidders, including JPMC & Co., through its subsidiary, JPMC Bank, for the sale of WMB.

84.    On September 24, 2008 JPMC & Co. and JPMC Bank submitted a bid to the FDIC for JPMC Bank to purchase WMB (the "JPMC bid").  The JPMC bid improperly utilized WMB confidential financial information gained as a result of false promises made in connection with the Confidentiality Agreement.

85.    The JPMC & Co. bid also attached a "JPMorgan Chase & Co. Secretary's Certificate" which attested that the Board of Directors of JPMC & Co. authorized JPMC & Co. and JPMC Bank "to enter into the proposed transaction involving the purchase and assumption by [JPMC & Co.] and/or [JPMC Bank] of selected assets and liabilities of thrift subsidiaries of Washington Mutual, Inc. from the Federal Deposit Insurance Corporation . . ."  The JPMC bid listed as "designated contact person for the Potential Acquirer:" Stephen M. Cutler, an Executive Vice President and General Counsel of JPMC & Co.  The JPMC bid also listed as contact persons Brian A. Bessey, who according to the Secretary's Certificate, was an officer of JPMC & Co., and Daniel P. Cooney, general counsel, who was listed as an officer of JPMC Bank.  Brian Bessey signed the bid that was submitted to the FDIC.

86.    Each of the JPMC contact persons named in the JPMC bid were part of the "Project West" working group, according to JPMC & Co. documents.

87.    On September 24, 2008, Wells Fargo submitted a separate proposal for the assumption of WMB deposits and purchase of assets.  The Wells Fargo proposal would have provided sufficient funds to ensure that WMB would honor the Plaintiffs' bond contracts.

88.    In its proposal, Wells Fargo stated it could not submit a bid within the structures set forth by the FDIC because of the "limited due diligence" afforded to Wells

Fargo and "the severe time constraints," together with uncertainties associated with WMB's assets and the market.

89.    Wells Fargo proposed the following alternate structure "that could serve as a basis for a bid in the event Washington Mutual is placed in a receivership[:]"

- Wells Fargo would assume all deposit liabilities (both insured and uninsured) for a premium to be specified in the bid that would be the best premium we could offer;

- All other liabilities would be initially assumed by the FDIC. . . .

- In addition to non-deposit liabilities, all assets would initially be retained by the FDIC.  During the 60 day period mentioned above, Wells Fargo would also conduct due diligence and decide which assets of Washington Mutual Wells Fargo would be willing to acquire.  Based on the limited due diligence conducted by Wells Fargo to date we estimate that Wells Fargo would be interested in acquiring assets representing between $50B - $100B of Washington Mutual's balance sheet;

- All assets not acquired by Wells Fargo would be retained by the FDIC.  In order to maximize recoveries for the FDIC and dispose of the assets in an orderly manner, Wells Fargo and the FDIC would enter into an asset management agreement containing appropriate incentives for Wells Fargo to achieve those goals and under which Wells Fargo, as the agent for the benefit of the FDIC, would manage and dispose of those assets at cost.

90.    The fact that Wells Fargo was a serious bidder for WMB is verified by the fact that, only one week later, and shortly after the Wells Fargo's WMB proposal was not considered by the FDIC, on October 2, 2008, Well Fargo presented a signed and Board-approved offer to purchase Wachovia Corporation as an intact company and without government assistance in a stock-for-stock merger transaction. By January 1, 2009, the Wells Fargo-Wachovia merger was completed.  The purchase of Wachovia transformed Wells Fargo into the nation's fourth-largest bank as measured by assets.

91.     JPMC & Co.'s negotiations with the FDIC, use of WMB's confidential information in its bid to the FDIC, and purchase of WMB assets, all violated the confidentiality and stand-still provisions of the Confidentiality Agreement.  The FDIC accepted JPMC & Co.'s bid, however, and did not consider Wells Fargo's proposal.

92.     Upon information and belief, JPMC & Co. manipulated the FDIC bidding process by exerting pressure upon potential competitors to not submit conforming bids, by constraining the time frame available to competitors to conduct due diligence, by constraining information available to potential bidders regarding WMB, and by encouraging and causing the FDIC to set bid parameters that would favor JPMC & Co. and lead other bids to be rejected as "non-conforming."

93.     On September 24, 2008, the FDIC board of directors "approved the Bid from JPMorgan Chase & Co."   On Thursday evening September 25, 2008, the OTS seized WMB and placed WMB into receivership with the FDIC.

94.     That same day, on September 25, 2008, the FDIC and JPMC Bank signed a "Whole Bank Purchase and Assumption" agreement whereby the FDIC, as receiver, sold WMB assets, including WMB's branches, deposit liabilities, loan portfolio, and covered bonds and secured debts, to JPMC Bank for $1.9 billion.

95.     Upon information and belief, the seizure of WMB was conducted a day earlier than had been originally planned due to an expected legislative banking relief plan— the "bailout"—that appeared imminent.  Earlier that week, on Tuesday, September 23, 2008, Federal Reserve Chairman Ben Bernanke and Treasury Secretary Henry Paulson had testified before the United States Senate Banking Committee regarding the dire implications for the broader economy if the bailout was not passed by the end of the week. The $700

billion financial bailout would have provided significant financial relief to WMB, as it ultimately did for other non-seized national financial institutions, thus making seizure more difficult to justify.

96.     On October 3, 2008, the FDIC also announced that it would raise the ceiling for deposit insurance from $100,000 to $250,000.  Many of the deposits WMB lost in mid-September came from accounts exceeding the earlier $100,000 limit.  According to Office of Thrift Supervision Director and FDIC Board Member John M. Reich's testimony to the United States Senate on April 16, 2010, if WMB's bank run had occurred two weeks later, there would have been no seizure because of the FDIC's decision to increase deposit insurance limits.

97.     Instead, Plaintiffs' WMB bonds became worthless.  On September 29, 2008, the FDIC, in an informational sheet later provided to claimants of WMB confirmed this result: "The FDIC as Receiver for Washington Mutual Bank does not anticipate that subordinated debt holders of the bank will receive any recovery on their claims."

98.     As a result of the FDIC deal, JPMC Bank gained 2237 branches and $126.3 billion in deposits (an increase of 63%), and reported a positive impact upon its retail financial services, card services and commercial banking divisions.

99.     More tellingly, in its 2008 annual report, JPMC & Co. reported that the fair value of WMB's net assets was $11.9 billion – $9.97 billion more than the $1.9 billion it paid the FDIC in the fire sale orchestrated by JPMC & Co.

100.    For the year 2008, JPMC & Co. booked an extraordinary gain due to negative goodwill resulting from the WMB acquisition in the amount of $1.9 billion, after allocating $8 billion of negative goodwill to nonfinancial assets.  This was in addition to the

a $581 million extraordinary gain reported on October 15, 2008 as being the result of the acquisition of WMB's assets. JPMC & Co. explained the gain in a footnote:

> JPMorgan Chase acquired the banking operations of Washington Mutual Bank for $1.9 billion. The fair value of the net assets acquired exceeded the purchase price which resulted in negative goodwill. In accordance with SFAS 141, nonfinancial assets that are not held-for-sale were written down against that negative goodwill. The negative goodwill that remained after writing down nonfinancial assets is recognized as an extraordinary gain.

101.    Moreover, even JPMC & Co.'s massive reported extraordinary gain does not reveal the full extent of the windfall reaped by JPMC & Co. as a result of the WMB transaction. When JPMC & Co. acquired the WMB assets, it recorded WMB's loans at "fair value," as estimated by JPMC & Co. pursuant to an accounting technique called "purchase accounting." However, because JPMC & Co. exaggerated WMB's loan losses, the WMB assets were inaccurately reduced in value.

102.    Thus, JPMC & Co. marked the $168.46 billion of WMB assets down to a book value of $90.1 billion. As a result, WMB loan portfolio had, as of September 25, 2008, a $32.66 billion reserve in "accretable yield," parked off of JPMC & Co.'s income statement, from which JPMC & Co. could draw over time, apparently to smooth its earnings.

103.    JPMC & Co. considered the probability of gaining income from an initial overestimation of WMB loan losses to be a strategic rationale that made the WMB asset acquisition to be "financially compelling." As JPMC & Co. explained in a slide presentation to Moody's on September 19, 2008 the WMB acquisition was "Financially Compelling" because it was "Accretive immediately; substantially so in future." In order to

make it clear why JPMC & Co. estimated WMB's loan losses in the way it did, JMPC & Co. explained that "Asset write-down reduces risk to volatility in future earnings."

104.     The accretable yield attributable to WMB's assets has provided JPMC & Co. with a total of $8.89 billion in income over the last three years in interest income:  In 2008, WMB's loans provided JPMC & Co. with accretion into interest income of $1.3 billion.  In 2009, JPMC & Co.'s accretion into interest income was $4.36 billion.  In 2010, JPMC & Co.'s accretion into interest income was $3.23 billion.

**Plaintiffs' WMB Bonds and the Defendants' Knowledge**

105.     The Plaintiffs owned the bonds listed below, which were issued by WMB. Each bond evidences debt owed to them by the issuer.  As such, the Bonds evidence the contractual obligation of WMB to pay to each Plaintiff a stream of future cash payments consisting of coupon payments and a payment of the principal value of the bond.

106.     WMB utilized a Global Note Program under which some of Plaintiffs' bond investments were offered.  The specifics of those offerings were described in Pricing Supplements.

107.     The 2002 Offering Circular covering the Note Issuance program for WMB and the Pricing Supplement provided that the bonds "will be governed by, and construed in accordance with the laws of the State of New York, United States of America, without regard to conflict of laws principles."

108.     Payments to Plaintiffs pursuant to the bond contracts were to be made to the Plaintiffs in the State of Texas.

109.     More specifically, the 2002 Offering Circular covering the Note Issuance program for WMB states:

> [Washington Mutual Bank] is obligated to make payments or principal of, and premium, if any, and interest on all of its Notes in the applicable specified currency . . . .

The Circular further provides:

> The applicable Pricing Supplement will specify a fixed interest rate per annum payable on a Fixed Rate Note. Unless otherwise specified in the applicable Pricing Supplement, the interest payment dates (the ''Interest Payment Dates'') for Fixed Rate Notes (other than Zero Coupon Notes) having a maturity greater than one year will be semi-annual on such dates specified in the applicable Pricing Supplement. Payments of interest on Fixed Rate Notes having maturities of greater than one year will include interest accrued to but excluding the relevant Interest Payment Date or Maturity. Unless otherwise specified in the applicable Pricing Supplement, interest on Fixed Rate Notes denominated in U.S. dollars with maturities of greater than one year will be computed on the basis of 360-day year of twelve 30-day months.

110.    Consistent with those terms, the Pricing Supplements utilized the interest payment dates of "January 15 and July 15 for each year . . ." up to the stated Maturity Date of the specific Bond, at which time remaining principal or par value of the Bond would be returned to the investor. These types of various Bond obligations entitled Plaintiffs to specific interest and principal payments from WMB.

111.    JPMC & Co., by way of a wholly-owned subsidiary, served as registrar and/or depository for some or all of the Global Bank Note Programs under which the Plaintiffs' bonds were issued, and thereby had knowledge of the terms and conditions of Plaintiffs' bond contracts. JPMC & Co.'s access to knowledge of the Bond contracts is described in the program circular for WMB's Global Bank Note Program of April 2002, on page 37:

> J.P. Morgan Trust Company, National Association will serve initially as the Registrar for the Registered Notes. In such capacity, the Registrar will cause to be kept at its offices in The City of New York, as register (the "Note Register") in which, subject to such reasonable regulations as it may

prescribe, the Registrar will provide for the registration of the Registered Notes and of transfers thereof.

112.    Through this special role with regard to WMB's bonds, its examination of WMB's confidential financial information, and access to other information, JPMC & Co. had actual and constructive knowledge of the contractual rights and obligations associated with the Plaintiffs' WMB bond contracts and was well aware of the contractual rights with which its scheme would interfere. Because of this actual and constructive knowledge of the WMB bond contracts at issue, JPMC & Co. knew that its scheme to effect the seizure and sale of WMB's valuable assets would create a default and totally prevent WMB from otherwise being able to perform its obligations under the contracts.

113.    ANICO owns the following WMB bonds:

| ISSUER | CUSIP | COUPON | MATURITY | PURCHASE DATE | PAR/FACE |
|--------|-------|--------|----------|---------------|----------|
| Washington Mutual Bank | 93933VAS7 | 5.5% | January 15, 2013 | October 9, 2003 | $5,300,000 |
| Washington Mutual Bank | 93933VAS7 | 5.5% | January 15, 2013 | October 14, 2003 | $5,079,000 |
| Washington Mutual Bank | 93933WAA4 | 6.875% | June 15, 2011 | October 15, 2002 | $3,000,000 |
| Washington Mutual Bank | 93933WAB2 | 5.65% | August 15, 2014 | September 16, 2004 | $5,000,000 |

114.    ANPAC owns the following WMB bond:

| ISSUER | CUSIP | COUPON | MATURITY | PURCHASE DATE | PAR/FACE |
|--------|-------|--------|----------|---------------|----------|
| Washington Mutual Bank | 93933WAA4 | 6.875% | June 15, 2011 | October 15, 2002 | $2,000,000 |

115.    FFLIC owns the following WMB bond:

| ISSUER | CUSIP | COUPON | MATURITY | PURCHASE DATE | PAR/FACE |
|--------|-------|--------|----------|---------------|----------|
| Washington Mutual Bank | 93933WAA4 | 6.875% | June 15, 2011 | May 16, 2002 | $5,000,000 |

116.    FFCIC owns the following WMB bond:

| ISSUER | CUSIP | COUPON | MATURITY | PURCHASE DATE | PAR/FACE |
|--------|-------|--------|----------|---------------|----------|
| Washington Mutual Bank | 93933WAA4 | 6.875% | June 15, 2011 | October 15, 2002 | $3,200,000 |

117.    NWL owns the following bonds:

| ISSUER | CUSIP | COUPON | MATURITY | PURCHASE DATE | PAR/FACE |
|--------|-------|--------|----------|---------------|----------|
| Washington Mutual Bank | 93933VAS7 | 5.5% | January 15, 2013 | January 23, 2004 | $5,000,000 |
| Washington Mutual Bank | 93933VAS7 | 5.5% | January 15, 2013 | January 26, 2004 | $4,000,000 |

**Causes of Action**
**Count One:  Tortious Interference with Existing Contract**
**JPMC & Co. and JPMC Bank**

118.    The allegations in the preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

119.    Each of the Plaintiffs' WMB bonds constituted a valid contract between WMB and each Plaintiff.

120.    JPMC & Co., through sources of information publicly available to all participants in the marketplace for financial instruments, through its position and

29

responsibilities as depository and/or registrar for some or all of Global Bank Note Programs under which the Plaintiffs' bonds were issued, through sources available to its subsidiaries, and through its extensive due diligence into the financial circumstances of WMB, knew of each of the Plaintiffs' WMB bond contracts, and was aware of terms and conditions of all of the contractual relations and rights relating to the outstanding debt obligations of WMB.  As such, the JPMC & Co. had actual and constructive knowledge of the existence of the Plaintiffs' WMB bond contracts and the fact that the JPMC Defendants' actions would interfere with Plaintiffs' rights under the WMB bond contracts.

121.     All knowledge held by JPMC & Co., as parent, is also imputed to JPMC Bank, its subsidiary.

122.     JPMC & Co. and JPMC Bank intentionally procured WMB's breach of the contract without justification, and in order to benefit themselves, and willfully and intentionally interfered with Plaintiffs' WMB bond contracts.

123.     JPMC & Co. and JPMC Bank made WMB's performance under the Plaintiffs' WMB bond contracts impossible, more burdensome, more difficult and more expensive by executing a scheme to strip away the source of revenue from which WMB was to meet its obligations under the contracts.  The scheme included, among other things, gaining access to WMB's confidential financial information under false pretenses, breaching an agreement to maintain the confidentiality of such information, breaching a stand-still agreement, driving down the credit ratings of WMB, inciting depositor withdrawals, and misusing the information.  In addition, JPMC & Co. obstructed efforts to sell WMB's assets under circumstances in which the Plaintiffs' bond contracts would be honored.  JPMC & Co. and JPMC Bank used their insider status and financial strength to

work to bring about a regulatory seizure of WMB and obtain the sale of WMB assets from federal regulators to JPMC & Co. and/or JPMC Bank under terms that would sever the Plaintiffs' contractual rights under the WMB bonds.

124.     As a direct and proximate result of Defendants' actions, the value of Plaintiffs' WMB bonds was reduced during the summer of 2008 up to September 25, 2008. In addition, as a proximate result of Defendants' actions, WMB was seized by regulatory authorities and WMB assets were sold under circumstances in which the Plaintiffs' bond contracts would not be honored.

125.     JPMC & Co.'s and JPMC Bank's actions proximately caused the Plaintiffs to suffer actual damage and loss consisting of loss of their rights and benefits inherent in their WMB bond contracts.

**Count Two:**
**Breach of Confidentiality Agreement – JPMC & Co.**

126.     The allegations in the preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

127.     On or about March 11, 2008, JPMC & Co. entered into the Confidentiality Agreement.  The Confidentiality Agreement is a binding contract.

128.     In September of 2008, JPMC & Co. expressed renewed interest in purchasing WMB and agreed to be bound by all terms of the Confidentiality Agreement. During this time, JPMC & Co. obtained additional confidential WMB information.

129.     JPMC & Co.'s negotiations with WMI and WMB in September of 2008 were a sham, and JPMC & Co.'s actions display an utter disregard for their obligations under the Confidentiality Agreement.

130.     The Plaintiffs, as bondholders of WMB, are intended beneficiaries of the Confidentiality Agreement.

131.     As intended beneficiaries of the Confidentiality Agreement, the Plaintiffs have a valid and enforceable interest in protecting WMB's confidential financial information from disclosure or misuse and to enforce JPMC & Co.'s stand-still obligations.

132.     The Plaintiffs, WMI, and WMB have performed all obligations owed under the Confidentiality Agreement.

133.     JPMC & Co. violated the Confidentiality Agreement by, among other things, disclosing confidential information and providing misleading analysis to rating agencies, the FDIC in its corporate capacity, news media, and investors, by negotiating with the FDIC for the purchase of WMB assets, and by using WMB confidential information to obtain favorable parameters for the FDIC bidding process and to develop and submit a bid to the FDIC.

134.     JPMC & Co.'s breach caused the Plaintiffs injury by preventing WMI and/or WMB from obtaining a purchaser for WMB assets under terms whereby the Plaintiff's WMB bond contracts would be honored.

135.     In addition, JPMC & Co.'s breach caused the Plaintiffs injury by causing the seizure and sale of WMB assets under terms in which the Plaintiff's WMB bond contracts would be broken.

136.     In addition, JPMC & Co.'s breach caused the Plaintiffs injury by preventing other purchasers, such as Wells Fargo, from having adequate time or information to negotiate with the FDIC-Receiver in order to submit a bid under which Plaintiff's WMB bond contracts would be honored.

137.     As a result, the Plaintiffs have been substantially harmed. The injuries to Plaintiffs consist of breaches of, and substantial impairment to, the Plaintiffs' WMB bond contracts, and significant financial losses as a result thereof.

## Count Three: Unjust Enrichment – JPMC & Co. and JPMC Bank

138.     The allegations in the preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

139.     JPMC & Co. and JPMC Bank received a windfall from the acquisition of WMB's assets by obtaining such assets stripped of the Plaintiffs' rights to the income generated by such assets.

140.     JPMC & Co. and JPMC Bank unjustly failed to pay the Plaintiffs for the benefits JPMC & Co. and JPMC Bank received by stripping Plaintiffs of their rights and benefits under their bond contracts and substantially impairing Plaintiffs' bond values.

141.     The Plaintiffs received overwhelmingly less than the value of what JPMC & Co. and JPMC Bank extracted from the Plaintiffs.

142.     The failure of JPMC & Co. and JPMC Bank to pay for the benefits they received is to the Plaintiffs' detriment and occurred only because JPMC & Co. and JPMC Bank used coercion, duress, and took undue advantage by way of false pretenses, deceit, breached trust, and broken promises, in order to obtain the WMB assets, unencumbered of Plaintiffs' contractual rights to payment, without fairly compensating the Plaintiffs for the loss of their WMB bond contract rights and values.

143.     As a result, the Plaintiffs have been substantially harmed. The injuries to Plaintiffs consist of substantial impairment of the Plaintiffs' rights under their WMB bond contracts, and attendant financial losses, which are particular to the Plaintiffs.

**FDIC-Receiver**

144.     The instant lawsuit asserts no claim against the FDIC, either in its corporate capacity or as receiver for WMB, and asserts no claim for which WMB, if it had not been put into receivership, could have been liable.  The FDIC receivership's claims administration process as set forth in the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1821(d)(3)-(10) & (13), is not applicable to this lawsuit.  *Am. Nat'l Ins. Co. v. FDIC, supra.*

145.     The FDIC-Receiver cannot pursue the claims asserted by the Plaintiffs herein, and has no authority to seek dismissal of the Plaintiffs' WMB bondholder claims.

146.     Congress, in defining the powers and duties of the FDIC as conservator or receiver, prescribed that the FDIC succeeds to "all rights, titles, powers and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution."  12 U.S.C. § 1821(d)(2)(A)(i).  Notably absent from this list is any succession to the rights, titles, powers and privileges of a "bondholder."

147.     The FDIC-Receiver does not own Plaintiffs' WMB bonds.  Nor did WMB own Plaintiffs' bonds or bond rights prior to being placed in receivership, since WMB was the debtor-obligor, not a creditor owed a right of payment, under these bonds.  When it became WMB's receiver, the FDIC-Receiver at most acquired WMB's obligations and rights, not creditors' rights in WMB bonds.  Moreover, a successful prosecution of the instant lawsuit claim would not diminish the potential assets available to satisfy other creditors of WMB.

148.     Plaintiffs' claims are based on their contract rights as WMB bondholders. Plaintiffs' claims are not based on rights, titles, powers or privileges of WMB, or any stockholder, member, accountholder, depositor, officer, or director of such institution. Plaintiffs' claims, which are claims against JPMC & Co. and JPMC Bank, also are not claims "with respect to" WMB.

149.     The nature of Plaintiffs' injury is the loss and damage to Plaintiffs' rights inherent in their bond contracts. Neither WMB nor the FDIC-Receiver has been harmed by the dishonoring of Plaintiffs' bond contracts.

150.     Here, JPMC & Co. and JPMC Bank inflicted direct injuries on the Plaintiffs, as bondholders, by, among other things, committing purposeful misconduct intended to strip away the Plaintiffs' bond contract rights.

151.     Even assuming that the FDIC-Receiver could pursue the Plaintiffs' claims under some circumstance – which it cannot – in this case the FDIC-Receiver has abandoned the claims and has an irreconcilable conflict.

152.     The FDIC-Receiver conducted no investigation into the claims asserted in the Plaintiffs' lawsuit before it agreed to join with JPMC & Co. in seeking to dismiss this case.  Shortly after the FDIC-Receiver received notice of the Plaintiffs' lawsuit, the FDIC-Receiver intervened in the instant lawsuit in opposition to these Plaintiffs, as an Intervenor-Defendant.  The FDIC-Receiver then sought dismissal of this case, claiming that "Plaintiffs' assertion of claims against JPMC and JPMC Bank . . . subjects the FDIC-Receiver to the very litigation burden that Congress sought to prevent."   *FDIC-Receiver's Motion to Dismiss* [Docket #87] at 11.

153.     The FDIC-Receiver never intended to pursue the claims asserted in the instant lawsuit.  In fact, the FDIC-Receiver agreed with JPMC & Co. to use the FDIC-Receiver's best efforts to dismiss this case.  The FDIC-Receiver now faces statutes of limitation and laches defenses that Plaintiffs do not, if the FDIC-Receiver were to attempt to file suit for a claim arising out of the facts alleged herein.

154.     In addition, the FDIC has admitted to an irreconcilable conflict-of-interest that makes the FDIC's fair and adequate prosecution of Plaintiffs' claims impossible.  The FDIC-Receiver declared in a prior pleading in this case that it has "a significant interest in this case as a potential indemnitor of JPMC Bank under the P & A [Purchase and Assumption] Agreement."  *FDIC-Receiver's Memorandum in Opposition to Plaintiffs' Motion to Dismiss* [Docket #93] at 16.  Because of this indemnification concern, the FDIC-Receiver is not, and cannot be, a proper bondholder representative in any tort action against JPMC & Co. or JPMC Bank.  The FDIC-Receiver's financial goals and obligations conflict with the goals of the Plaintiffs.

### Prayer

Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon trial of this cause judgment be rendered for Plaintiffs against both Defendants JPMC & Co. and JPMC Bank, jointly and severally, as follows:

a.     All actual, consequential, and special damages;

b.     Punitive damages as provided by statutory and common law;

c.     Attorneys fees and legal expenses (including expert fees), as authorized by law;

d.     Pre- and Post- judgment interest;

e.      Equitable relief to which Plaintiffs may be entitled;

f.      Costs of court; and

g.      For such general and other and further relief to which Plaintiffs may be entitled at law or in equity.

Plaintiffs respectfully demand a trial by jury.

Respectfully submitted,

By:   /s/ Gregory S. Smith
Gregory S. Smith (D.C. Bar #472802)
LAW OFFICES OF GREGORY S. SMITH
913 East Capitol Street, S.E.
Washington, D.C.  20003
Telephone:  (202) 460-3381
Facsimile:  (877) 809-9113
Email:  gregsmithlaw@verizon.net

Andrew J. Mytelka
Texas State Bar No. 14767700
Joseph R.  Russo, Jr.
Texas State Bar No. 24002879
Steve Windsor
Texas State Bar No. 21760650
James M. Roquemore
Texas State Bar No. 24058082
GREER, HERZ & ADAMS. LLP
One Moody Plaza, 18th Floor
Galveston, Texas  77550
Telephone:  (409) 797-3200
Facsimile:  (409) 766-6424

ATTORNEYS FOR PLAINTIFFS

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on September 30, 2011, a copy of this document was filed with the Court's ECF filing system, which will provide electronic notification of its filing to all counsel who have noticed their appearance in this action.


           /s/ Gregory S. Smith                 
Gregory S. Smith