## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                              )
AMERICAN NATIONAL INSURANCE   )
COMPANY, *et al.*,                                       )
                                                              )
        **Plaintiffs,**                                )
                                                              )
      **v.**                                                  )     **Civil Action No. 09-1743 (RMC)**
                                                              )
JPMORGAN CHASE & CO., *et al.*,              )
                                                              )
      **Defendants.**                             )
_____)


## OPINION

      Bondholders of Washington Mutual Bank ("WaMu" or the "Bank") sue JP Morgan Chase Bank and JP Morgan Chase Co. (together "JPMC") for allegedly spreading misinformation about WaMu that caused credit raters and federal regulators to doubt the Bank's ability to weather the financial storm of 2008.  As a result of these alleged nefarious activities, JPMC was able to acquire WaMu at a fire-sale price and the bonds were rendered worthless. Plaintiffs sue JPMC for tortious interference with their bond contracts, unjust enrichment, and breach of a confidentiality agreement between JPMC and WaMu's parent company, Washington Mutual, Inc.  Before the Court is a motion to dismiss the First Amended Complaint.  The motion will be granted in part and denied in part.

## I.  FACTS

      The First Amended Complaint ("Complaint") makes the following allegations. The Court assumes the truth of the Complaint's allegations of fact in ruling on a motion to dismiss.  *Bell Atl. v. Twombly,* 550 U.S. 544, 555 (2007).  Plaintiff Bondholders were investors

in WaMu, a subsidiary of Washington Mutual, Inc., who received bonds in return for their

investments in WaMu.   The bonds "evidence the contractual obligation of [WaMu] to pay to

each Plaintiff a stream of future cash payments consisting of coupon payments and a payment of

the principal value of the bond." Am. Compl. [Dkt. 131] ¶ 105.   However, the Office of Thrift

Supervision ("OTS") put the Bank into receivership with the Federal Deposit Insurance

Corporation on September 25, 2008, and the FDIC-Receiver sold the Bank's assets and limited

liabilities to JPMC on the very same day.   As a result, the bonds were rendered worthless and the

Bondholders are unable to collect.   The Amended Complaint makes the following allegations

regarding the events leading up to the sale of WaMu's assets and certain WaMu liabilities to

JPMC.

On March 11, 2008, JP Morgan Chase Co. ("JPMC Co.") executed a

confidentiality agreement with Washington Mutual, Inc. ("WMI") regarding a possible

acquisition of either WMI or WaMu.  *Id.* ¶ 23.   Pursuant to the agreement, JPMC Co. received

internal financial information about the Bank but was restricted to using the information solely

for the purpose of evaluating the transaction.   JPMC expressly agreed to keep such information

"strictly confidential." Id. ¶ 25.  The confidentiality agreement specified that it was for the

benefit of WMI and its subsidiaries, their representatives, and their respective successors and

assignees.  *Id.* ¶ 31.  JPMC Co. violated the confidentiality agreement by disclosing confidential

WaMu information to third parties and regulators and did not destroy all confidential documents

after its bid to purchase WaMu was rejected on April 8, 2008.  *Id.* ¶ 37.

The Amended Complaint alleges that JPMC Co. then embarked on a scheme to

"to acquire the assets of [WaMu], stripped of the liability to bondholders and other

stakeholders," *id.*, through regulatory intervention by using financial misrepresentations to create

a bid scenario for WaMu that would be profitable for JPMC.  JPMC Co.'s conduct in this regard is described by the D.C. Circuit in *American National Insurance Co. v. Federal Deposit Insurance Company*, 642 F.3d 1137 (D.C. Cir. 2011), and need not be fully repeated here.  In short, the Bondholders allege that JPMC Co. used WaMu's confidential financial information in presentations to credit rating agencies, in which JPMC Co. overestimated WaMu's loan losses and underestimated its liquidity and financial health, which led to a reduction in WaMu's credit ratings and a "loss of 25 percent or more of the value of Plaintiffs' [WaMu] bonds" in the months before September 2008.   Am. Compl. ¶¶ 47- 48.   In its quest for "government intervention in its plan to acquire [WaMu]," *id.* ¶ 34, JPMC "knowingly overestimated [WaMu] loan losses and otherwise disparaged [WaMu's] financial health," *id.* ¶ 55, and disclosed to various third parties that JPMC Co. was discussing a potential acquisition of WaMu with the FDIC in order to incite a "bank run" and "drive down [WaMu]'s credit ratings."  *Id.* ¶ 56.

Meanwhile, JPMC Co. resumed its own acquisition negotiations with WaMu on false pretenses, as it merely sought access to more confidential information for use in JPMC's bid to FDIC.   JPMC Co. acted on the knowledge that the FDIC-Receiver would be more likely to sell WaMu to JPMC Co. if the FDIC-Receiver perceived that JPMC Co. were better positioned than other bidders to operate WaMu because of its advanced due diligence.  *Id.* ¶¶ 68- 70.  Throughout September 2008, JPMC Co. continued to meet with credit agencies, disclosing confidential information regarding the Bank and insinuating that JPMC was considering an acquisition of WaMu from an FDIC receivership, which again caused credit rating agencies to downgrade WaMu's rating.  These actions also caused the intended run on WaMu, and depositors withdrew $16.7 billion from the Bank between September 15 and September 25, 2008 causing an alleged "liquidity crisis" for WaMu.  *Id.* ¶ 76.

As a consequence, the FDIC began seeking bids for the sale of WaMu on September 23, 2008, before the OTS seized the Bank. The Director of OTS is authorized to issue charters for federal savings associations. *See* 12 U.S.C. § 1464. The Director is also authorized to appoint a conservator or receiver for any insured savings association, if the Director determines that any ground under 12 U.S.C. § 1821(c)(5) exists, *i.e.*, the institution has insufficient assets to fulfill its obligations or has suffered a substantial dissipation of its assets. Under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 83 (1989) ("FIRREA"), the FDIC may accept an appointment for to act as a receiver. *See* 12 U.S.C. § 1821(c)(1). Congress enacted FIRREA to enable the FDIC and the Resolution Trust Corporation to expeditiously wind-up the affairs of failed financial institutions throughout the country. *Freeman v. FDIC*, 56 F.3d 1394, 1398 (D.C. Cir. 1995). Under the FIRREA, the FDIC-Receiver may merge or transfer any asset or liability of the institution under receivership. 12 U.S.C. § 1821(d)(G). In addition, under this statutory scheme, the FDIC-Receiver succeeds "to all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i).

The Amended Complaint alleges that JPMC Co. "manipulated the FDIC bidding process by exerting pressure upon potential competitors to not submit conforming bids, by constraining the time frame available to competitors to conduct due diligence, by constraining information available to potential bidders regarding [WaMu], and by encouraging and causing the FDIC to set bid parameters that would favor JPMC [] Co. and lead other bids to be rejected as 'non-conforming.'" Am. Compl. ¶ 92. For example, the FDIC received a bid from Wells

Fargo & Company, which stated that it could not conform to the FDIC's bid structure because of "limited due diligence" and "severe time constraints." *Id.* ¶ 88. On September 24, 2008, FDIC's board of directors approved JPMC Co.'s bid for WaMu and on September 25, 2008 OTS seized WaMu and placed it into receivership with the FDIC. That very same day JP Morgan Chase Bank ("JPMC Bank") and FDIC-Receiver signed a Purchase and Assumption Agreement "whereby the FDIC, as receiver, sold [WaMu] assets, including [WaMu]'s branches, deposit liabilities, loan portfolio, and covered bonds and secured debts, to JPMC Bank for $1.9 billion." *Id.* ¶ 94.

Consequently, the bonds in question in this suit became worthless; FDIC-Receiver circulated a contemporaneous information sheet warning that it did not anticipate that subordinated debt holders of WaMu would receive any recovery of the debt. The Bondholders allege that JPMC Co. "caused the Plaintiffs injury by preventing other purchasers, such as Wells Fargo, from having adequate time or information to negotiate with the FDIC-Receiver in order to submit a bid under which Plaintiff's . . . bond contracts would be honored." *Id.* ¶ 136.

The Amended Complaint alleges the same three causes of action as its original: Count I, tortious interference with existing contract against JPMC collectively; Count II, breach of confidentiality agreement against JPMC Co.; and Count III, unjust enrichment against JPMC collectively. It alleges that JPMC "willfully and intentionally interfered" with the bond contracts and procured WaMu's breach of the contracts "without justification, and in order to benefit themselves." *Id.* ¶ 122. The Bondholders further allege they suffered injury through JPMC Co.'s breach of the confidentiality agreement because the release of confidential financial information caused the seizure and sale of WaMu, which led to a breach of the bond contracts. The Bondholders specifically allege that JPMC Co.'s breach caused the seizure and sale of

WaMu assets under terms by which WaMu's bond contracts would not be honored. *Id.* ¶ 133-34. Finally, the Bondholders advance a claim for unjust enrichment, asserting that JPMC was unjustly enriched because it failed to pay Bondholders for the benefits it received from stripping Bondholders of "their rights and benefits under their bond contracts and substantially impairing [their] bond values." *Id.* ¶ 140.

The Bondholders' original complaint was brought in Texas State Court, removed to the U.S. District Court for the Southern District of Texas, and then transferred to the U.S. District Court for the District of Columbia. Their first complaint was dismissed because this Court determined that the Bondholders' injuries depended on FDIC-Receiver's sale of WaMu's assets to JPMC, such that the Bondholders were required to pursue their claims administratively. *Am. Nat'l Ins. Co. v. JPMorgan Chase & Co.*, 705 F. Supp. 2d 17, 21 (D.D.C. 2010) (citing FIRREA, 12 U.S.C § 1821(d)(13)(D)(ii), which provides for court review of disallowed claims after exhaustion of administrative remedies). This holding was reversed on appeal when the D.C. Circuit found that the Bondholders' suit is against JPMC, a third party, for its own wrongdoing, and not against the depository institution for which the FDIC is receiver and thereby the suit is not covered by FIRREA's administrative claims process. *Am. Nat'l Ins. Co.,* 642 F.3d at 1142. The D.C. Circuit remanded the case to this Court, at which time the Bondholders amended their complaint.

JPMC and the FDIC-Receiver (the "Defendants") again move to dismiss, alleging that FIRREA still blocks the Bondholders' claims because their claims are derivative of harm to WaMu and now belong to the FDIC-Receiver. The Court agrees that the claims alleged in Counts II and III of the Amended Complaint, breach of the confidentiality agreement and unjust enrichment, belong to the FDIC-Receiver and that the Bondholders have failed to state a claim in

either count.  These two counts will be dismissed.  However, Count I, alleging tortious

interference with the existing contract by JPMC, is a cause of action that belongs to the

Bondholders for which they have sufficiently stated a claim.  Defendants' motions will be denied

with respect to Count I.

## II. LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)

challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated

a claim.  Fed. R. Civ. P. 12(b)(6).  Federal Rule of Civil Procedure 8(a) requires that a complaint

contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

Fed. R. Civ. P. 8(a)(1).  A complaint must be sufficient "to give a defendant fair notice of what

the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007) (internal citations omitted).  Although a complaint does not need detailed factual

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do."  *Id.*  The facts alleged "must be enough to raise a right to relief above the

speculative level."  *Id.*  Rule 8(a) requires an actual showing and not just a blanket assertion of a

right to relief.  *Id.* at 555 n.3.  "[A] complaint needs *some* information about the circumstances

giving rise to the claims." *Aktieselskabet Af 21. Nov. 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 16

n.4 (D.C. Cir. 2008) (emphasis in original).

In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged

in the complaint, documents attached to the complaint as exhibits or incorporated by reference,

and matters about which the court may take judicial notice.  *Abhe & Svoboda, Inc. v. Chao*, 508

F.3d 1052, 1059 (D.C. Cir. 2007) (internal quotation marks and citation omitted).  To survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570. When a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, then the claim has facial plausibility. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. But a court need not accept as true legal conclusions set forth in a complaint. *Iqbal*, 129 S. Ct. at 1949. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 1950.

## III.  ANALYSIS

This Court must determine in the first instance whether the rights to bring any of the Bondholders' claims rest solely with FDIC-Receiver. It will begin its analysis where the D.C. Circuit ended. The Circuit noted Defendants' argument that the Bondholders lack standing to bring their claims because the claims "are for generalized harm to [WaMu] and thus belong to the FDIC-[R]eceiver." *Am. Nat'l Ins. Co.,* 642 F.3d at1145. The D.C. Circuit further noted that FDIC-Receiver had succeeded "to all rights, titles, powers, and privileges of the insured depository institution." *Id*. (citing 12 U.S.C. § 1821(d)(2)(A)). The Circuit identified several "knotty questions" raised by the Defendants' argument. *Am. Nat'l Ins. Co.,* 642 F.3d at 1145. It queried: "Are the 'rights, titles, powers, and privileges' inherited by the FDIC-as-receiver from

Washington Mutual determined exclusively by reference to state law or does federal law play a role? If we should look to state law, which state's law governs the claims asserted in this case, and what does that state law dictate? What is the substance of the applicable body of law? And, most basically, is the ownership of the claims presented below a jurisdictional question, as the FDIC and JPMC suggest, or is it a question of whether appellants have a cause of action?" *Id.*

Defendants answer these questions as follows:  Under federal law, the FDIC-Receiver succeeds to all claims that derive from harm to a failed bank generally, *see* § 1821(d)(2)(A); either Washington or Nevada state law should define whether the Bondholders' claims are legally derivative of harm to the Bank and, under either state's laws, the claims are derivative;  FDIC-Receiver argues that the Bondholders have failed to state a claim under Rule 17(a)(1) of the Federal Rules of Civil Procedure,[1] because the claims belong to it and, therefore, the Complaint should be dismissed; and JPMC argues that Plaintiffs lack standing but then concludes that "decisions have consistently dismissed claims for failure to state a claim at this stage in the litigation," rather than for lack of jurisdiction.  JPMC's Mem. in Supp. of Mot. to Dismiss ("JPMC Mem.") [Dkt. 133-1] at 20.

### A.   Jurisdiction of the Court

Federal courts are courts of limited jurisdiction.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Lack of standing is a defect in subject-matter jurisdiction. *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  To have constitutional standing under Article III, a plaintiff must establish: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed

---

[1]  Rule 17(a)(1) states that "[a]n action must be prosecute[d] in the name of the real party in interest."  Fed. R. Civ. P. 17(a)(1).

to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  The Bondholders have met the Article III standing requirements.  They allege the loss of value in their bond contracts as an injury in fact and trace it to JPMC's campaign to destroy WaMu's financial position so that JPMC could purchase WaMu's assets in a transaction that would lead to the certain failure of performance of the bond contracts at issue, and a favorable decision against JPMC would redress their financial loss.

Beyond Article III standing, a plaintiff must also meet prudential standing requirements.  Such requirements embody "judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  "[P]rudential standing notions mandate that a plaintiff's suit seeks to vindicate his own legal rights or interests, not those of some absent third party." *Steffan v. Perry*, 41 F.3d 677, 697 (D.C. Cir. 1994).  In this Circuit, "prudential standing . . . [,] like Article III standing, [is] a jurisdictional concept." *Id*.  JPMC contends that the Bondholders' claims really belong to WaMu/FDIC-Receiver, which has chosen to settle and not litigate, so the Bondholders lack standing.

JPMC actually argues two points.  First, JPMC argues that the Bondholders' claims are completely derivative of an injury to WaMu.  Second, JPMC argues that the derivative nature of the Bondholders' claims means that the Bondholders lack standing to pursue them.  However, the D.C. Circuit has ruled that where a claim is derivative, it is not barred by the considerations that underlie prudential standing; instead, plaintiffs with a derivative claim are not the "real parties in interest" under Rule 17(a) and therefore have failed to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Because only "the real party in interest" can prosecute

an action under Rule 17(a), such an action "must be brought by the person entitled under the governing substantive law to enforce the asserted right." *Whelan v. Abell*, 953 F.2d 663, 672 (D.C. Cir. 1992).

In general, a suit is derivative if it enforces a corporate cause of action. *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 95 (1991). Allowing recovery for derivative claims can be problematic because:

> [It] is a form of double counting. 'Corporation' is but a collective noun for real people-investors, employees, suppliers with contract rights, and others. A blow that costs 'the firm' $100 injures one or more of those persons. If, however, we allow the corporation to litigate in its own name and collect the whole sum (as we do), we must exclude attempts by the participants in the venture to recover for their individual injuries . . . . Divvying up the recovery [to the participants individually] would be a nightmare . . . . Why undertake such a heroic task when recovery by the firm handles everything automatically?-for investors, workers, lessors, and others share any recovery according to the same rules that govern all receipts.

*Labovitz v. Wash. Times Corp.,* 172 F.3d 897, 898 (D.C. Cir. 1999) (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*, 877 F.2d 1333, 1335-36 (7th Cir. 1989)).

*Labovitz v. Washington Times* concerned creditors' claims and applied the same analysis: creditors do not lack standing to advance claims that are derivative to a corporation, but they are not the real parties in interest and are thus susceptible to dismissal. *Labovitz*, 172 F.3d at 902-903. Peter and Sharon Labovitz were shareholders, directors, and officers of DCI Publishing, Inc. and had personally guaranteed loans to DCI. They complained that the *Washington Times*, a daily newspaper in D.C., had failed to make promised loans to DCI in order to facilitate the newspaper's acquisition of DCI at a distressed price. The complaint alleged that "the Times' dealings with [the Labovitzes] and DCI substantially reduced the value of their interests in DCI [and] triggered their personal guarantees of loans to DCI" and brought claims

11

for breach of fiduciary duty, fraud, and negligent misrepresentation.  *Labovitz*, 172 F.3d at 898.
The Circuit found a "personal guarantor [to be] sufficiently similar to a creditor of a
corporation," to affirm dismissal of these claims as derivative under Delaware law.  *Id.* at 898.
The D.C. Circuit adopted the Seventh Circuit's analysis in *Weissman v. Weener,* 12 F.3d 84 (7th
Cir. 1993), to the effect that "even when a third party injures a corporation, forcing it into
bankruptcy and triggering its guarantors' obligations on loans, the shareholder-guarantors'
claims are generally derivative rather than direct, and therefore they are not 'the real party in
interest.'"  *Labovitz*, 172 F.3d at 902 (quoting *Weissman*, 12 F.3d at 87).  *Whelan* and *Labovitz*
make clear that this Circuit requires dismissal, under Rule 17, of any of the Bondholders' claims
that are merely derivative of an injury to WaMu.  Contrary to JPMC's argument, it is not a
question of standing.

### B.  Ownership by FDIC-Receiver

Section 1821(d)(2)(A)(i) of FIRREA, which  provides that  the FDIC-Receiver
"shall . . .by operation of law, succeed to – (i) all rights, titles, powers, and privileges" of the
Bank, "and of any stockholder, member, accountholder, depositor, officer, or director . . . with
respect to the [Bank] and the assets of the [Bank]," immediately raises the question of whether
the FDIC-Receiver owns all of the Bondholders' claims, as successor to WaMu.  In its
consideration of this very question, the D.C. Circuit queried whether it invoked federal or state
law.  *Am. Nat'l Ins. Co.*, 642 F.3d at 1145.  Defendants correctly respond that it invokes both.

Federal law mandates that the "rights" and "powers" "with respect to
the . . . assets" of the Bank devolved to FDIC-Receiver.  12 U.S.C. § 1821(d)(2)(A)(i).  "This
language appears to indicate that the FDIC-receiver steps into the shoes of a failed bank,
obtaining the rights of the insured depository institution that existed prior to receivership."

*O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) (internal quotation marks and citations omitted).  Thus, under § 1821(d)(2)(A), the FDIC-Receiver is charged with "work[ing] out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise."  *Id*. at 87.  Consequently, the FDIC-Receiver controls all claims that a failed bank might have against others.  Here, the Bondholders bring multiple tort claims against JPMC under state law (tortious interference with contract, breach of the confidentiality agreement and unjust enrichment).  If those claims are "corporate causes of action"[2] that belonged to WaMu, they are a "right" of the failed Bank that passed to FDIC-Receiver under § 1821(d)(2)(A)(i); *cf. Pareto v. FDIC*, 139 F.3d 696, 700 (9th Cir. 1998) (interpreting stockholder rights that the FDIC succeeds to under § 1821(d)(2)(A)(i) as including stockholder rights to bring derivative action).

### 1.   Choice of Law

The determination of whether all of the Bondholders' claims are derivative in nature, and therefore claims that belonged to WaMu, is an issue of state law.  *O'Melveny*, 512 U.S. at 85 ("[M]atters left unaddressed in . . . a [statutory] scheme are presumably left subject to the disposition provided by state law.").  In this regard, the Court faces an initial question of which forum's choice of law rules to apply.  The Bondholders argue that Texas law applies, while Defendants argue for the law of Washington or Nevada.  Since the laws of these states differ in certain respects, it is necessary to apply choice of laws rules to decide which state's law will govern.

If jurisdiction in this case were founded on diversity of citizenship, a court would automatically apply the law of the forum state.   A federal court sitting in diversity must apply

---

[2] *See Kamen*, 500 U.S. at 95.

state law to the substantive issues before it, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78

(1938), and the choice of law provisions of the forum state. *Klaxon Co. v. Stentor Elec. Mfg.*

*Co.*, 313 U.S. 487, 496 (1941). However, the immediate inquiry is more complicated because

jurisdiction is based upon the statutory requirement that all cases involving the FDIC arise under

federal law and *Erie* and *Klaxon* are not immediately applicable.[3]

      FDIC-Receiver argues that because jurisdiction is based upon a federal statute,

federal common law regarding choice of laws is applicable. Without explanation, JPMC baldly

states that District of Columbia choice of law rules apply. The Court concludes that JPMC has it

right. Judicial creation of federal common law rules is justified in few cases. *Atherton v. FDIC*,

519 U.S. 213, 218 (1997). "Thus, normally when courts decide to fashion rules of federal

common law, 'the guiding principal is that significant conflict between some federal policy or

interest and the use of state law . . . must first specifically be shown.'" *Id.* (quoting *Wallis v.*

*Pan Am. Petroleum Corp.*, 384 U.S. 63, 68 (1966)) (alterations in original). In this case, the

parties have not presented a federal interest that needs protection. *See Atherton*, 519 U.S. at 225

(noting that when FDIC is receiver of a failed bank, there is no need to protect a federal interest

by applying federal common law). The Court finds no specific reason why the standard put forth

in *Klaxon* should not prevail, and D.C. choice of law rules apply. *See, e.g.*, *A.I. Trade Fin., Inc.*

*v. Petra Int'l Banking Corp.,* 62 F.3d 1454, 1464 (D.C. Cir. 1995) (finding "no reason to

---

[3] The Bondholders assert, mistakenly, that the choice of laws rules applicable in the U.S. District
Court for the Southern District of Texas apply to this case because venue was transferred
pursuant to 28 U.S.C. § 1404(a), which allows transfer of a case to any district where it could
have been brought for the convenience of the parties, pursuant to which this Court would be
obliged to apply state law as if there were no change in venue. *Mar-Jac Poultry, Inc. v. Rita*
*Katz*, 773 F. Supp. 2d 103, 111-12 (D.D.C. 2011) (citing *Van Dusen v. Barrack*, 376 U.S. 612,
638-39 (1964)). Plaintiffs are incorrect, quite simply because this case was transferred pursuant
to 28 U.S.C. § 1406(a), which allows transfer of cases in the "interest of justice" when they were
filed in the incorrect venue.

remove" a case, in which jurisdiction was based upon the federal "Edge Act[,] from what appears to be the general rule: a federal court applies state law when it decides an issue not addressed by federal law").   When jurisdiction in federal court arises under federal law, "to adopt any rule other than that of *Klaxon* would, in the words of the Supreme Court, 'do violence to the principle of uniformity within a state, upon which [*Erie*] is based.'"   *Id*. (quoting *Klaxon*, 313 U.S at 496) (alteration in original).

To determine which jurisdiction's law applies in tort cases, District of Columbia courts blend a "governmental interest analysis" with a "most significant relationship" test. *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (2009) (citing *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40-41 (D.C. 1989); *Jaffe v. Pallotta Teamworks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004); *Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191, 193-94 (D.C. Cir. 1999)).   Under the governmental interest test, a court evaluates which state's policy would be most advanced by having its law applied.   *Id*.   To determine which state has the most significant relationship to a case, courts balance the competing interests of the relevant states.   *Id.*   This second test involves consideration of four factors: "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicil[e], residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship is centered."   *Id*. (quoting Restatement (Second) of Conflict of Laws § 145(2) (internal quotation marks omitted)).

The Bondholders assert that they were the victims of tortious conduct and Texas law should apply to determine their injuries because they were denied payment that should have been made in Texas, under the WaMu bonds; one of the Plaintiffs is incorporated in Texas and

two have their principal places of business in Texas; and Texas has a recognized interest in applying its own substantive law to protect the rights of its citizens.

The substance of the claims may call for the application of Texas law, a point not decided here, because that is where the alleged harm occurred.  However, the pertinent issue now is whether the Bondholders may even bring their claims or whether, as Defendants contend, all of the claims belonged to WaMu.  This is an issue regarding the governance of the corporation itself.  "[T]he choice between derivative and direct litigation is a choice about how (and by whom) the internal affairs of the firm are managed."  *Labovitz v. Wash. Times Corp. ("Labovitz I"),* 900 F. Supp. 500, 503 (D.D.C. 1995) (quoting *Bagdon v. Bridgestone/Firestone, Inc.,* 916 F.2d 379, 382 (7th Cir. 1990)).  When a claim addresses matters of corporate governance or other internal affairs of a company, D.C. courts apply the law of the state of incorporation.  *City of Harper Woods Emps' Ret. Sys. v. Olver,* 589 F.3d 1292, 1298 (D.C. Cir. 2009); *Labovitz I,* 900 F. Supp. at 503 ("When a particular claim addresses matters of corporate governance or other internal affairs of the organization, most states apply the law of the state where the corporation is incorporated, and the District of Columbia follows suit." (internal citations omitted)).

WaMu was a federally chartered bank and therefore did not have a state of incorporation.  The Supreme Court has agreed that "the State closest analogically to the State of incorporation of an ordinary business is the State in which the federally chartered bank has its main office or maintains its principal place of business."  *Atherton,* 519 U.S. at 224.[4]  In this case, "[WaMu's] primary executive and business office was in Seattle, Washington." Am. Compl. ¶ 16.  Its home office is in Nevada.  *Id.*  The Court will look to Washington State law to

---

[4]  The Supreme Court approved this analysis as one, but not necessarily the only, approach. *Atherton,* 519 U.S. at 224.

decide the derivative nature of the Bondholders' claims, as Washington State has the stronger interest in having its law applied and it best fulfills the Restatement factors.

## 2. Derivative Actions

Under Washington law, a derivative suit is one in equity to enforce a corporate right. *LaHue v. Keystone Inv. Co.*, 496 P.2d 343, 350 (Wash. Ct. App. 1972). Washington State courts analyze a plaintiff's right to bring a derivative action under the rubric of standing. In Washington State, a shareholder may, in some circumstances, have standing to bring such derivative suits, while creditors, such as bondholders, do not.

The State's "doctrine of standing requires that a plaintiff must have a personal stake in the outcome of the case in order to bring suit." *Gustafson v. Gustafson*, 734 P.2d 949, 952 (Wash. Ct. App. 1987). Under Washington law, a shareholder ordinarily "cannot sue for wrongs done to a corporation, because the corporation is a separate entity: the shareholder's interest is viewed as too removed to meet the standing requirements." *Sabey v. Howard Johnson & Co.*, 5 P.3d 730, 735 (Wash. Ct. App. 2000). However, due to the potential for abuse by the officers and directors of a corporation, Washington, like most jurisdictions, has created an exception for shareholders to bring derivative suits on behalf of a corporation.[5] *Gustafson*, 734 P.2d at 953.

"Washington has adopted the majority rule for determining whether an action may be brought individually or must be brought derivatively on behalf of all shareholders."

---

[5] To bring such a suit, the party must meet the following requirements "(1) he or she must be a shareholder at the time of the complained of transaction, (2) the action must not simply be collusive in order to confer jurisdiction on the court, (3) the complaint must allege what attempts the shareholder made to have the directors or corporation bring the suit, and (4) the shareholder bringing suit must fairly and adequately represent the interests of the class." *Gustafson*, 734 P.2d at 953.

*Hayton Farms, Inc. v. Pro-Fac Co-op., Inc.*, No. 10-520, 2011 WL 2898651, at * 4 (W.D. Wash.

July 18, 2011).

> The action is derivative, that is, in the corporate right, if the
> gravamen of the complaint is injury to the corporation, or to the
> whole body of its stock or property without any severance or
> distribution among individual holders, or if it seeks to recover
> assets for the corporation or to prevent the dissipation of its assets
> . . . . If damages to a stockholder result indirectly, as the result of
> an injury to the corporation, and not directly, he cannot sue as an
> individual.

*Id.*  (citing 12B Fletcher, Cyclopedia of Corporations, § 5911, 421 (perm. ed.)).  Under

Washington State law, "[s]tanding to bring a stockholder derivative claim requires a proprietary

interest in the corporation whose right is asserted."  *Haberman v. Wash. Pub. Power Supply Sys.*,

744 P.2d 1032, 1061 (Wash. 1987) (en banc).  In contrast, bondholder's rights are contractual in

nature.  As creditors, bondholders have no equitable standing to sue derivatively under

Washington State law.  *Id.*

JPMC and the FDIC-Receiver insist that the Bondholders' claims here are totally

derivative in nature and that Washington State law denies the Bondholders any right to sue

derivatively on WaMu's behalf.  In light of Washington law, this Court agrees that two of the

Bondholders' counts are clearly barred and can be readily disposed of.

### 3.  Counts III and II

Count III of the Complaint (unjust enrichment) alleges that JPMC "used coercion,

duress, and took undue advantage by way of false pretenses, deceit, breached trust, and broken

promises," in order to obtain WaMu's assets, unencumbered of the Bondholders' contractual

rights to payment, without fairly compensating the Bondholders for the value they lost in the

WaMu bonds.  Am. Compl ¶ 142.  Their complained of injury consists of "substantial

impairment" of rights under the bond contracts.  The alleged "coercion, duress and … undue

advantage" ran *from* JPMC *to* WaMu, not to the Bondholders.  The unjust enrichment suffered

by the Bondholders as a result was caused by multiple intervening events, all of which happened

*to* WaMu and not to the Bondholders.  The Court concludes that the "gravamen of the complaint

is injury to the corporation, or to the whole body of its stock or property without any severance,"

*Hayton Farms,* 2011 WL 2898651, at *4, and the Bondholders' claim in Count III is, therefore,

derivative.

 Count II of the Complaint (breach of the confidentiality agreement) suffers from

the Bondholders' lack of privity with JPMC because they were not parties to the agreement.  It is

clear that WaMu would have a claim against JPMC if such a breach existed, but this is not

necessarily fatal to the Bondholders' claims if there were a separate duty owed to them, breached

by JPMC.  *See Hanson v. Shim*, 943 P.2d 322, 329 (Wash. 1997) (stockholder may sue "when

the injury resulted from the violation of a special duty to the stockholder that was independent

from his status as a stockholder, even when the corporation may have a similar cause of action");

*Sabey*, 101 Wash. App. at 585 (recognizing exception "where there is a special duty, such as a

contractual duty, between the wrongdoer and the shareholder").   But this does not help

Bondholders, who identify no separate legal right or duty that ran from JPMC to them as a result

of the confidentiality agreement.

 The Bondholders argue that the confidentiality agreement was for the benefit of

WMI and WaMu's stakeholders.  This is inaccurate since the text of the agreement specified that

it was for the benefit of the Bank and its representatives, successors, and assignees, Am. Compl.

¶ 31, not its shareholders or more general stakeholders.  Consequently, the confidentiality

agreement does not show by its terms, nor do the Bondholders sufficiently allege, that JPMC

assumed some obligation to the Bondholders such that they have rights as third-party

beneficiaries to the confidentiality agreement.  *See Lonsdale v. Chesterfield*, 662 P.2d 385, 389

(Wash. 1983).  Even if the confidentiality agreement could be deemed for the benefit of

shareholders, the Bondholders had an entirely different legal relationship with WaMu.

Under the laws of the State of Washington, the Bondholders cannot sue

derivatively for an injury to WaMu.  The Court finds that Counts II and III make claims that

belonged to WaMu under state law and that passed to the FDIC-Receiver as a "right" under

§ 1821(d)(2)(A). As such, these claims must be dismissed pursuant to Rule 17(a).[6]

### 4.   Count I.

Count I raises a much closer question than the other counts.  It alleges that JPMC

knew of each of the bond contracts at issue and the outstanding debt obligations of WaMu.  Am.

Compl. ¶ 120.  It further alleges that "JPMC & Co. and JPMC Bank intentionally procured

[WaMu's] breach of contract without justification, and in order to benefit themselves, and

willfully and intentionally interfered with Plaintiffs' [WaMu] bond contracts." *Id.* ¶ 122.  In

addition, it alleges that "JPMC & Co. and JPMC Bank used their insider status and financial

strength to work to bring about a regulatory seizure of [WaMu] and obtain the sale of [WaMu]

assets from federal regulators to JPMC & Co. and/or JPMC Bank under terms that would sever

the Plaintiffs' contractual rights . . . ." *Id.* ¶ 123.  And finally, "[a]s a direct and proximate result

---

[6]  The Bondholders also allege that FDIC-Receiver has a conflict of interest arising from an indemnification agreement with JMPC or has abandoned the claims alleged in the Amended Complaint.  The facts do not support an exception to FIRREA to allow them to bring such claims. *Compare Delta Savings Bank v. United States*, 265 F.3d 1017, 1024 (9th Cir. 2001) (finding an exception where FDIC-Receiver was asked to sue OTS, a closely related sister agency); *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1295 (Fed. Cir. 1999) (conflict existed where FDIC-Receiver "was asked to decide . . . whether it should sue the federal government based upon a breach of contract, which, if proven, was caused by the FDIC").  There is no structural impediment between FDIC-Receiver  and JPMC, as in the cited cases, and those parties insist that these claims have been settled between WaMu and JPMC, not abandoned.

of Defendants' actions," it alleges that "the value of Plaintiffs' [WaMu] bonds was reduced

during the summer of 2008 up to September 25, 2008." *Id.* ¶ 124.

As framed, Count I does not allege an injury to WaMu, but to the Bondholders.

Through the described conduct, JPMC allegedly breached a legal duty to the Bondholders, *i.e.*,

not to interfere willfully with their contracts. Such injuries are particular to the Bondholders, are

not generalized harms to the corporation, and, as a result, are not derivative in nature.

FDIC-Receiver and JPMC hyperventilate over such a conclusion, predicting the

end of FIRREA's purposes and goals if creditors are allowed to escape the confines of the

statutory scheme. With the insight provided by the Circuit, this Court is not persuaded. Count I

of the Amended Complaint charges JPMC with underhanded commercial activities that predate

FDIC's involvement (much less FDIC-Receiver) but are alleged to have directly injured these

Bondholders intentionally. Neither WaMu nor its assets is affected by the Bondholders' Count I.

These conclusions open no Pandora's Box: one presumes that underhanded commercial activities

designed to drive an acquisition target into FDIC receivership are rare; the nature of the

Bondholders' specialized contractual relationship with WaMu distinguishes them from other

creditors; and it does not shock the conscience if misconduct breeds its own rewards.[7]

---

[7] JPMC urges the Court to dismiss Count I, even if not derivative of WaMu rights, because it
fails as a matter of law. For purposes of considering the Defendants' motions to dismiss, the
Court applies New York State law because that is the law that expressly governed the bond
contracts pursuant to its offering circular, two of the Bondholders have their principal places of
business in New York, JPMC is in New York and its alleged conduct centered there. This
decision is made without prejudice to any further argument, after discovery, that the parties
might wish to make as to what state's law applies. The Bondholders have sufficiently alleged a
claim for tortious interference under New York law. *Compare Kronos, Inc. v. AVX Corp.*, 612
N.E.2d 289, 292 (N.Y. 1993), *with* Am. Compl. Count I; *Derdiarian v. Felix Contracting Corp.*,
414 N.E.2d 666, 670 (N.Y. 1980). At this point in the litigation, the Court must treat all of the
Bondholders' allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. The
Bondholders have pled a factual scenario that is "plausible on its face," *Iqbal*, 556 U.S. at 677,
and satisfied proximate causation concerns raised by JPMC.

**IV. CONCLUSION**

For the reasons set forth above, the motions to dismiss will be granted in part and denied in part.  The motions to dismiss, Dkts. 132, 133, will be granted as to Counts II and III of the Amended Complaint, which will be dismissed.  The motions will be denied as to Count I. The parties shall meet and confer and submit a proposed discovery schedule no later than October 15, 2012.  The Courtroom Deputy shall set a scheduling conference for soon thereafter. A memorializing Order accompanies this Opinion.


Date:  September 28, 2012                              _____/s/_____
                                                                              ROSEMARY M. COLLYER
                                                                              United States District Judge